Lerdo Land Company v. Commissioner.
Lerdo Land Co. v. Commissioner
Docket No. 9062.
United States Tax Court
1947 Tax Ct. Memo LEXIS 16; 6 T.C.M. (CCH) 1285; T.C.M. (RIA) 47333; December 19, 1947
*16 Petitioner's cost basis determined for lands sold by it in 1941 to 1943, inclusive. Thomas R. Dempsey, Esq., 1104 Pacific Mutual Bldg., Los Angeles 14, Calif., H. B. Thompson, Esq., and Arthur H. Deibert, Esq., for the petitioner. A. J. Hurley, Esq., and R. E. Maiden, Jr., Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies in declared value excess-profits tax and income tax for the years 1941 to 1943, inclusive, as follows: Declared Value
Excess-Profits
Income
Year
Tax
Tax
1941
$7,338.89
$40,235.28
1942
3,066.54
24,721.08
1943
2,011.56
40,005.72
Certain adjustments made by respondent in determining the deficiencies are not contested. The issues submitted are: (a) the March 1, 1913 fair market value of land acquired by petitioner in 1911; and (b) the cost to petitioner of approximately 62 acres of land acquired by petitioner in 1934. Certain facts have been stipulated and other facts hereinafter set out in our findings of fact were established by evidence introduced *18 upon the hearing. Findings of Fact Petitioner is a California corporation, organized on March 10, 1911. Its principal office is at Los Angeles, California, and its returns for the taxable periods here involved were filed with the collector of internal revenue for the sixth district of California. At all times herein material the petitioner kept its books and filed its returns on a cash receipts and disbursements basis, using calendar year accounting periods. On March 17, 1911, the petitioner purchased from one John McWilliams 7,100 acres of land in Kern County, California, lying south of Famoso and 10 miles north of Bakersfield. Petitioner paid $216,484.12 for this property. Out of this tract thus purchased, petitioner sold to the Standard Oil Company of California on April 11, 1911, all of Section 3, Township 29 South, Range 27 East, consisting of 633.20 acres, for a cash consideration of $55,411.10, or an average price per acre of $87.50. It was petitioner's plan to develop water upon the tract of land acquired from McWilliams and to subdivide it into 10-acre lots, or multiples thereof, for sale. On October 2, 1912, petitioner entered into a contract with one C. E. Miller, *19 under which the latter was given an exclusive agency to sell the land. Under this contract Miller was required to sell not less than 1,500 acres during the first year and not less than 2,500 acres in the second year. In the event that the minimum requirements were met for the first two years, the contract provided that it would be extended for a third year during which Miller would be permitted to sell the remainder of the land. This contract provided that the petitioner should proceed and continue in the development of water wells upon the lands, and to equip such wells with the necessary casings, pumps and motors, the wells to be so developed, equipped and constructed as to carry water to each 20-acre lot of the land sold, sufficient to furnish and supply 50 miner's inches for each 160 acres of land. The right to use such wells and the water produced therefrom was to be conveyed with the lands as appurtenant thereto without additional cost to the purchaser, except the payment of his proportionate part of the cost of producing and delivering the water. The aforesaid contract with Miller specified that the lands be sold by him at a price of not less than $150 per acre, upon terms *20 of not less than one-tenth cash and one-tenth of the purchase price payable each year thereafter, deferred payments to bear interest at the rate of six per cent per anuum. The contract obligated Miller to pay his costs of advertising and selling the property. His commission upon sales at the $150 minimum was $50 per acre. Any amount in excess of $150 per acre was to be divided equally between petitioner and Miller. Prior to the acquisition of the aforementioned tract of land by petitioner, the former owner, McWilliams, had sunk one water well thereon on the northwest side of the Southern Pacific Railroad which traversed the property. This well was in Section 24, Lot 52, and was known as Well No. 1. Its rate of discharge was 540 gallons per minute, which was an equivalent of 60 miner's inches. Throughout 1912 the drilling of wells was continued by the petitioner and eight additional wells were either sunk or in the process thereof by September or October of that year. On October 31, 1912, the petitioner made a contract with one Harp whereby the latter agreed to drill seven wells on the tract within six months from the date of the contract. By March 1, 1913, petitioner had spent $25,323.65 *21 on wells, pumping plants and improvements and on that date five of the wells were actually producing. Of these five wells, the identifying numbers, the location, and the discharge in gallons per minute were as follows: Discharge
Well
Gallons
No.
Location
Per Minute
2
Lot 47, Sec. 31
2,300
4
Lot C, Sec. 15
970
5
Lot 39, Sec. 31
760
7
Lot 33, Sec. 31
795
9
Lot 49, Sec. 24
970
On March 1, 1913, Well No. 1, which had been drilled by the preceding owner and which had produced prior to that date, was not then operating due to the fact that it had "sanded up". In October 1912, petitioner employed one Hyatt, an engineer, to prepare plans for water districts and to make estimates of the additional requirements necessary to fulfill the company's obligations for delivery of water. This engineer made a survey of the property and subdivided it into 10 proposed water districts. His estimate of the cost to petitioner in the drilling of additional wells necessary to furnish the needed irrigation and meet its obligation to the purchasers of land was approximately $12.50 per acre. Soon after Miller entered into the foregoing contract with petitioner *22 he began selling acreage in the tract. He was responsible for bringing one G. William Schlicten to Lerdo. Schlicten was an inventor who had developed a decorticating machine for extracting fiber from hemp and ramie and it was believed that the Lerdo tract would be suitable for raising these fibrous plants. Schlicten was given a two-year lease covering 212 acres in Sections 14 and 15, which, in addition to other things, gave Schlicten an option to buy the leased land for $125 per acre if he would farm it to hemp and ramie. To the land so leased to Schlicten was attached the right to use of necessary water from the aforesaid Well No. 2. This was by far the largest producing well of any of those developed. It was thought that Schlicten's development of a portion of the land in the successful cultivation of hemp and ramie would interest other parties to purchase the lands for similar cultivation, it being anticipated that a plant would ultimately be erected to use Schlicten's process in recovering hemp from these two crops. If successful, this would prove a profitable industry as hemp and ramie fiber brought a very high price. The first contract of sale by Miller of a portion of the *23 lands in question was made on October 21, 1912. By March 1, 1913, Miller and his agents had secured contracts for the sale of 824.09 acres at a uniform price of $150 per acre. By March 1, 1913, petitioner had sold or contracted for sale 1,457.24 acres of the land including that sold to the Standard Oil Company, as hereinbefore detailed. It had also leased 212 acres to Schlicten and had made crop leases for 443.54 acres. As of March 1, 1913, the water developed from wells sunk was sufficient to furnish the necessary amount for which petitioner was obligated for the acreage then sold. The soil on the tract in question is and was on March 1, 1913, technically classified as Adelanto or Delano soil which was a sandy loam. The land lying on either side of the railroad track was excellent land. The land south and west of the railroad track needed some leveling on March 1, 1913. On the north and east of the railroad track the land was practically level but had some "hog wallows" in it which made it less attractive than that to the south and east of the railroad track. Topographically, the land slopes gently from the northeast to the southwest. On March 1, 1913, some alfalfa and grain were *24 growing on the southwest side of the railroad track, but nothing was under cultivation on the northeast thereof. The pumping lift of the wells developed on the tract by March 1, 1913 made it economical for agriculture to be practiced there, being from 50 to not over 100 feet. One H. T. Miller, the brother of C. E. Miller, petitioner's sales agent, owned approximately 160 acres on the highway northeast of the railroad in Section 23, adjoining the Lerdo tract. This was raw land in 1912 but Miller developed a water well and planted an olive orchard on this acreage. By the fall of 1913 this farm was an outstanding one in the county and was used as a showplace for prospective purchasers in the Lerdo tract. Subsequent to 1913, difficulty was experienced with respect to the development of water for irrigation purposes at the cost originally anticipated. Before March 1, 1913, it had been determined definitely that sufficient water underlay the Lerdo tract for irrigation purposes and it was thought that this could be tapped with wells which would supply the necessary water at an annual cost of approximately $4 per acre. It later developed, however, that the cost of furnishing water for *25 irrigation would be double this figure, if not more, and certain of the purchasers of land elected to forfeit their contracts. Some of the parties who had purchased land just prior to March 1, 1913 were not farmers but had bought with the expectation of having the land farmed for them by tenants and had figured that the profits from such operation would be sufficient to meet the deferred payments for which they were obligated. Not all of the purchasers, however, were of this type. Some of them were experienced farmers who bought the land because, in their judgment, it was worth the amount paid for it for farming operations by them. Included among purchasers of the land at $150 per acre were F. C. Noel, one of the salesmen employed by Miller, and L. M. Farnham, one of petitioner's officers. Both of these parties bought a substantial acreage. Noel paid 25 per cent of his purchase price at the time of sale, although only 10 per cent was required. Another purchaser was Hyatt, the engineer employed by petitioner to survey the property for water districts and estimate the cost of necessary water development. After questions began to arise as to the cost of the furnishing of water for irrigation, *26 petitioner decided to withdraw the remaining land from sale. Following this, the petitioner held the land off of market. It farmed some of it. Another factor contributing to petitioner's decision to withdraw the remaining land from sale was that subsequent to 1913 it developed that Schlicten's decorticating invention was not workable and, although the land had been proven to be adaptable for the raising of hemp and ramie and crops of these plants had been successfully grown, this type of farming was necessarily abandoned due to the fact that there would be no facility for the extraction of the fiber. From 1931 to 1934, the petitioner farmed lots 31, 32, 33, 36, 37 and 38 of Section 24, under an arrangement with the owner, L. M. Farnham, to whom the petitioner had originally sold the property. Petitioner furnished the farming costs and charged them against the owner. By 1934, Farnham owed petitioner for these advanced costs the sum of $7,046.12. He decided that he did not want to incur further indebtedness on account of the property and deeded it to petitioner in 1934 in consideration for the debt which he owed the company. This tract of land was included among that sold by petitioner *27 in 1943, as hereinafter set out, and in computing net income for that year petitioner computed its gain upon a cost of $7,046.12. In determining the deficiencies for that year here involved, respondent allowed no cost for the property because it was determined by him that the farm cost to petitioner, in the sum of $7,046.12, had been deducted by petitioner as expense in the years 1931 to 1934, when expended. During the calendar year 1941, of the land originally acquired from John McWilliams the petitioner sold 1,279.03 acres for a net selling price of $188,405.44. During the calendar year 1942, it sold 936 acres of this land for a net selling price of $129,812.52. During the calendar year 1943, the petitioner sold 2,163.216 acres for a net selling price of $324,328.16. In addition to this it sold 62.805 acres which was the land acquired from Farnham in 1934, as above detailed. On its returns for the calendar years 1941 to 1943, inclusive, petitioner disclosed the sales of this property but reported no gain therefrom. In the deeds passing title under the sales made from 1941 to 1943, inclusive, the petitioner reserved certain mineral rights. These rights had no fair market value on *28 March 1, 1913. In determining the deficiencies here involved for the years 1941 to 1943, inclusive, the respondent determined that all of the land which was acquired from John McWilliams in 1911, and which lies on either side of the railroad track, had a March 1, 1913 value of $40 per acre, and that the 830 acres lying to the northeast of the main tract had a March 1, 1913 value of $10 per acre. The lands acquired by petitioner from John McWilliams in 1911 and sold by it, as above set out, had a fair market value on March 1, 1913, as follows: Mar. 1, 1913
No. of
Net Selling
Town-
MDB
Value
Acres
Price
Description
Sec.
ship
Range
& M
Per Acre
Sales in 1941
1,034.83
$154,544.45
All of Sec. 15 West of S.P.R.R. track
15
28S
26E
$130.00
W 1/2 and SE 1/4 and E 1/2 of NE 1/4
22
28S
26E
120.00
Portion of NE 1/4 East of Calloway Canal
27
28S
26E
120.00
237.94
33,118.94
Lots 6-9, 17-25, 29-31, 38-44, 53-56
4
29S
27E
75.00
6.26
742.05
50.00
1,279.03
$188,405.44
Sales in 1942
834
$114,665.57
W 1/2 and NE 1/4 lying West of Lerdo
31
28S
27E
120.00
Canal.
All of Sec. 36 lying East of Calloway
36
28S
26E
120.00
Canal.
102
15,146.95
Lots 1-5, 13-19, A, B, M and C
15
28S
26E
125.00
936
$129,812.52
Sales in 1943
230.00
Lots 4, 6, 7, 8, 9, 36-43, 48-52, 57-61
25
28S
26E
120.00
50.00
Lots 14-16, 26-27
26
28S
26E
120.00
77.94
Lots 7-9, 22
30
28S
27E
100.00
Lots 1-3, 13
31
28S
27E
160.00
SW 1/4
28
28S
27E
75.00
10.00
Lot 1
24
28S
26E
100.00
22.155
Lots 14, 15
25
28S
26E
100.00
246.97
Lots 26-30, 40, 41, 1-6, 10-18
24
28S
26E
100.00
532.22
Lots 51-55, 1-18, 21-46
14
28S
26E
100.00
N 1/2
1
28S
26E
830.00
SW 1/4
6
28S
27E
25.00
E 1/2
7
28S
27E
12.931
50.00
2,163.216
*29 Opinion The principal issue submitted is determined by the ascertainment of the fair market value on March 1, 1913 of the several tracts of land sold by the petitioner in the three years here involved. The record is quite voluminous and the testimony contradictory. Respondent introduced only one witness, an expert professional real estate appraiser, one Allen, who placed values upon the several tracts ranging from $30 to $50 per acre, as of March 1, 1913, except two tracts which he valued at $75 per acre. It will be noted that values as of March 1, 1913 fixed by this witness are considerably in excess of the values used by respondent in determining the deficiencies. These values so fixed by respondent were $40 per acre for the land lying on either side of the Southern Pacific Railroad track and $10 per acre for the 830 acres lying to the northeast of the main tract. We have given careful consideration to the testimony of the witnesses with respect to the March 1, 1913 values and find it difficult to accept the opinion of value made by respondent's witness, Allen. This witness was manifestly intelligent. He had been employed a few weeks prior to the hearing to inspect the tract *30 in question and make an investigation to base his estimate of what the fair market value of the various parcels was on March 1, 1913, a date more than 30 years prior to his investigation. He had had no actual knowledge of the properties as of that time except what he had casually seen on several occasions when passing through this district by train. His investigation consisted of examining the recorded deeds covering sales of property in this general vicinity on or about the critical date, talking to various old residents about their recollection as to conditions existing at that time, inspecting the area in its present condition and studying the transcripts of testimony in two law suits between petitioner and its agent, Miller, growing out of the latter's contract for the sale of the property. It is more than difficult for us to accept such a basis as serving as an accurate foundation for the determination of a March 1, 1913 value of this property, in the face of the record of various sales of this property to purchasers at $150 per acre on March 1, 1913 and in the few months prior to that date. There is no indication in the record that the sales in late 1912 and early in 1913 were *31 a result of a high pressure selling campaign in which properties were sold to ignorant purchasers upon false or exaggerated representations as to their value. This could not be reasonably contended in the face of the fact that three of the buyers at $150 per acre were Noel, one of the agents selling the land, and Farnham, an officer of petitioner, and Hyatt, petitioner's engineer. These men were well acquainted with the property and its possibilities. Petitioner introduced the testimony of two witnesses. The first of these, F. C. Noel, had moved to Bakersfield, a few miles from this property, in 1911. He had some knowledge of farming land since he had owned a farm in Illinois before coming to California. In 1910 he had purchased 10 acres of property in Kern County, six miles east of Bakersfield, for $150 per acre and had had it improved with an orange grove in the thought that perhaps the area was suited for citrus crops. This witness is a man of education and marked intelligence. He was in the newspaper business and on coming to Bakersfield established there a newspaper and a publication known as "The Daily Report", which listed the instruments filed with the Recorder's Court *32 each day, such as leases, mortgages and deeds of conveyance. This report is still being published. In 1912, upon the execution by petitioner of its sales contract with Miller, this witness was employed by the latter in the sale of farm sites from the Lerdo tract. He made many sales of this property shortly prior to March 1, 1913, and was at that time familiar with the property and the conditions then existing, both with respect to the character of the land and the water supply facilities. He also knew then the various sales made of the property and the individuals purchasing it and the results of the operation of the purchased tracts following their acquisition by the new owners. He has for many years been familiar with and active in connection with real estate in Kern County and, at the time of the hearing, owned, in connection with others, between 15,000 and 16,000 acres of land in that county. This witness's testimony as to the March 1, 1913 fair market value of the land in question was that the property sold by petitioner in the taxable years in Section 4 had a fair market value on the critical date of $85 per acre and that the values of the other tracts ranged from $125 to $150 *33 per acre on that date. Petitioner's other witness on values was a Mrs. Follansbee, who was at the time of the hearing a California State Inheritance Tax appraiser in the Com9troller's office. She was born in Bakersfield, California. In 1913, she went into the office of her father, a United States Land Office attorney, who maintained an office at Bakersfield. In her work there she prepared mortgages, leases and conveyances and became familiar with Kern County land values. She had been familiar with the Lerdo tract from childhood. Prior to giving her testimony she had made an investigation of the various conveyances of property at times proximate to March 1, 1913 and had refreshed her recollection of conditions and values as of that date by talking to persons who had been residents of the section at that time. This witness testified to a March 1, 1913 value of the parcels sold by petitioner in the taxable years here involved in Section 4 of $87.50 an acre as compared with $85 per acre testified to by Noel. She ascribed a value of $30 per acre to the three small parcels sold from Sections 1, 6 and 7. On the remaining parcels she placed values ranging from $87.50 to $150 per acre. *34 We have carefully examined the testimony of these witnesses and the explanations given by them as to the different factors upon which their conclusions were based. The evidence convinces us that the estimate of values made by respondent's witness, Allen, is too low in view of the actual sales of the property made shortly prior to March 1, 1913. It is clear from the record that property values for farm land were increasing rapidly at the time petitioner acquired this property. At that time the existence of water sufficient for irrigation purposes had not been determined and the lands could be said to have a market value only for dry farming purposes, such lands being of much less value than lands subject to irrigation. Shortly after the acquisition of these lands, as a result of the drilling by petitioner of several wells, it became apparent that the necessary water for irrigation purposes could be secured. This unquestionably increased greatly the fair market value of the property. The soil was suitable for the raising of various crops. At the time of the hearing it was testified, without contradiction that this property is now a perfect "Garden of Eden", irrigated and planted to *35 grains, fruits, alfalfa and vegetables. However, our opinion is, upon the entire record, that in most instances the estimates of fair market value for the land as of March 1, 1913, by petitioner's witnesses, are somewhat excessive. They do not appear to have taken into consideration that purchasers of this land were paying $150, not for the land alone but for that together with the contract obligation of petitioner to develop the necessary water for irrigation purposes and that this had been represented to them to be possible of development at an annual cost to them of $4 per acre. After careful consideration, we have found the values of the various parcels sold in the amounts set out in our findings. The remaining issue is the cost to petitioner of 62.805 acres consisting of Lots 31 to 33, inclusive, and 36 to 38, inclusive, in Section 24, sold by it in 1943. This property was part of the tract originally purchased from McWilliams and had formerly been sold by petitioner to one L. M. Farnham, an officer of the company. From 1931 to 1934, inclusive, the petitioner farmed this acreage for Farnham under an arrangement whereby petitioner advanced the farming costs. By September 25, 1934, the *36 amount of these advances totaled $7,046.12 and Farnham decided that he did not care to go into debt any further and made an arrangement under which, in consideration of the cancellation of the indebtedness, the property was conveyed by him to petitioner. On the sale by petitioner of this property, it used as its basis in computing gain the sum of $7,046.12, the amount of the debt of Farnham given as the consideration for its conveyance. Respondent, in determining the deficiencies for 1943, allowed no cost basis to petitioner for the property in question upon the ground that petitioner had on its returns for 1931 to 1934, inclusive, deducted the farming costs advanced to Farnham as its own expense. With respect to this item, the burden of proof is upon petitioner to establish that these costs were not deducted by it. The evidence falls far short of that necessary to sustain this burden. The only evidence offered by petitioner was that of its secretary-treasurer, one Voelkel, who, when asked if petitioner had in fact deducted as its expense the costs to it of the operations carried on for Farnham, replied that he did not know since he knew nothing about the books of the company or *37 how the matter was treated. The evidence with respect to the deduction of this item in earlier years was in the possession of petitioner and could readily have been shown. It is fair to assume that petitioner's failure to disclose this information which it possessed was due to the fact that such disclosure would not have sustained its contention as to the cost basis of the property. Petitioner contends, upon brief, that the testimony of Voelkel contradicts the basis of respondent's determination as to the deduction by petitioner of these expenditures. Respondent, in the deficiency letter, states the basis of the determination as information furnished the revenue agent by Voelkel. The testimony of the latter does not contradict this fact since the witness merely states that he did not tell the revenue agent that petitioner had taken credit for these expenditures. There is no denial that he furnished information to the revenue agent from which the determination as to the deduction was ascertained. It is further noted that even had petitioner entered upon its books the amounts due from Farnham as accounts receivable, such accounts would not have been included in its income for the several *38 years as its books were kept and its returns made upon a cash receipts basis. Respondent is sustained upon his action with respect to this item. Decision will be entered under Rule 50.